Mr. Joseph, good morning. Good morning. Welcome to you, and please proceed with your argument. This case is a little bit complicated because it has quite a number of issues. You have to husband your time carefully because you probably won't have time to fully discuss every issue raised in the brief, but the selection of the argument is entirely up to you as well as the sequence, so we'll be glad to hear your argument. Thank you. My name is Joel Joseph. I'm from Bethesda, Maryland, representing Carpad and Steven Saylor, the appellants in this case. I'm afraid to say that we have become a knockoff nation. No longer are knockoffs only sold by street vendors. They are now being sold in reputed catalogs and stores. Just last week Well, I don't know how much of your time you want to spend on editorials. We're quite aware of what the policies of the patent law are. The question is whether there's reversible error on any of the particular rulings that you challenge here. I was getting to that briefly. Just last week, Coach sued Target Stores, a national chain, for copying its products. This court should send a clear message that knockoffs are not to be tolerated. It's not our job to send messages. It's our job to decide appeals in accordance with the facts and the law. So the question for us is, under the precedence, is there reversible error in the rulings that you challenge or not? Yes, there certainly are reversible errors, Your Honor. Steven Saylor invented the Carpad, a mat that goes onto a garage floor to trap liquids and run off. The United States Patent Office issued a patent to him. He also has issued patents in Canada, Japan, Australia, and New Zealand. We're told that if you build a better mousetrap, that the world will come to your door. When you build a better mousetrap, like Mr. Saylor did, it will be copied. The Carpad name was also issued a registered trademark by the United States Patent and Trademark Office. Mr. Saylor, a sole inventor, did everything he could to protect his intellectual property rights. Mr. Joseph, not to belabor the point, and it's your time, but you're giving a speech, not an argument. The first issue is invalidity for obviousness. Is that correct? Yes, that's correct. And there's prior art, which clearly seems to indicate that subject matter is substantially the same as what's claimed. There was prior art. Why is that wrong? There was one specific difference between the prior art and Mr. Saylor's invention, and that was the insertion of a vinyl hose to prevent liquids and to keep the Carpad rigid. Well, that's why the holding was obvious, obviousness rather than anticipation. Why does that difference, which seems fairly minor, there were other insertions in the prior art, why does that difference not render the claimed invention obvious? It's the same concept. It's the same concept. This difference actually made the product work and function and be sold and be a success in the marketplace. And I've given the analogy in the briefs that there were prior art and patents on the electric light bulb before Mr. Edison. Let's talk about the carmat. We're talking about the sleeve portion at the edge of the carmat. And you're saying it was inventive to use a pliable hose as the filler for the sleeve as opposed to the pliable materials used in prior art sleeves. And I don't see why the hose is any different. It seems to me it would be equally obvious to use as the insert in the sleeve any of a hundred materials so long as they had the sufficiently pliable quality that when the tire runs over them, they crush down and then they spring back up so that the sleeve once again has enough height. I don't see how you've answered Judge Lurie's question about why using the hose as the sleeve insert wasn't an obvious variation of the prior art. Well, it may appear obvious in retrospect, but at the time, no one else did it. He was the first one to use a vinyl hose. That doesn't make it non-obvious. The issue is whether it was an obvious thing to do given what the prior art taught. The prior art taught you need to put something in the sleeve that has a springy kind of quality so that after the tire flattens out momentarily, the sleeve, it will spring back up because the insert in the sleeve has that quality to it. It seems like any material that has the springy quality would work fine as a sleeve insert, including a hose. It would seem that, but it's not actually true. The other products were foam and did not work. I think the analogy is precisely on point with the electric light bulb. Yes, you can use many products for a filament, but the one that Edison used was the one that actually worked. Edison, like Mr. Saylor, experimented and experimented and tried many different things to fill that perimeter on the car pad, just like Mr. Edison experimented with hundreds of materials. Was there evidence in the record that these hundreds of materials were tried and didn't work effectively and that the material claimed here produced unexpected advantages compared with what was in the prior art? Yes. We held a hearing on that, Your Honor. Where is the evidence of that? There was a transcript. I'm not sure if it's in the record. It should be in the record. You're not sure? Well, I'm pretty sure it's in the record. We held many proceedings over the last several years, and I think that was on a motion for a preliminary injunction where the judge heard testimony about how the device was invented, the experimentation of Mr. Saylor, and so forth. No, no. On the obviousness issue that was decided on summary judgment, did you create an evidentiary record in the obviousness summary judgment context showing unexpected results that the hose worked way better than all the other materials? Yes. Well, where is it? What is it? Well, we referred to the earlier testimony, and there was an affidavit from Mr. Saylor submitted with the opposition to the motion for summary judgment. Where is that in the record? In the appendix? I will get the reference. All right. On rebuttal. Okay. Fine. Carpet sold its products to Brookstone for seven years. During that time, the product sold so well that Brookstone decided to copy it and have it made in Taiwan. They also still kept the copy in the carpet with the registered trademark notice when they sold their imitation product. And one of the issues before this court is whether the district court's disallowance of evidence being presented or of the argument being made that it was an intentional trademark infringement. The district court granted J Moll on intentionality at the close of your evidence. That's correct. And what's the error? The error was that there was evidence of intentionality, and I'll give the examples. First of all, just the fact that they were selling their imitation product in response to the copy that said carpet with the registered trademark notice, that's enough. However, there was also a letter from their attorney where they were asking if it was all right to sell this other product, and the attorney warned them not to. Because what? They told them, well... Because it was a patent. That's right. But we're not talking about the patent now. We're talking about trademark infringement and whether the trademark infringement was intentional, right? Yes, that's right. But it shows that they intentionally... As far as it seems to me. But it does go to the intentionality. They knew about the patent, and they warned about the utility patent, and therefore they must have intentionally infringed the trademark. I don't see any connection between the two issues. In the same copy, in their catalog, they said it was patented and it had a trademark as well. They were both hand in glove together. They used the copy that said car pad does this, car pad does that, and then they supplied customers with the knockoff. Mr. Jones, if I can ask you, please. You're arguing that there was willful trademark infringement, correct? That's correct. We don't need to get to that issue if we determine that there was no error in the jury finding of genericness with respect to the car pad mark. That's correct. What is your precise complaint about that jury finding? Are you complaining about... I wasn't clear. Are you complaining that the judge's instructions for genericness were improper? Yes, I am. Okay, now, in that regard, please, where exactly are... I'm looking at the... I guess there's an appendix attached to your brief, the blue brief. Where exactly in there are the instructions to which you point and which you say were improper in that appendix? I'll give you that citation on rebuttal, but let me just point to the point that I think was the most confusing part of the instruction. The court told the jury that if they found that car pad was used as a noun, that it was generic. Now, I think that's absolutely incorrect. I thought the instruction said that use as a noun would be an indication that it might be generic, not that it had to be found generic. And I thought the instruction concluded with a sentence specifically saying that even if it is used as a noun, you, the jury, don't have to find that it's generic. So it seems to me you're grotesquely misdescribing what the instruction contained. I think the instruction to a lay jury is still misleading when the court says that if it's a noun, it's strong evidence that it is... The case law holds that it is strong evidence, not necessarily conclusive, but strong evidence. I still think the instruction was confusing to the jury, and that if you look... In that regard, if you could, the reason I'm interjecting, when you take a look at the record and come back up on the vote, it appears to me that there are two instructions relating to this generic issue. One is at page 76 of the appendix attached to the blue brief, your brief. And the other is at pages 80 through 81. Both of them address genericness. One is instructions 28. That's the one at 76. And the other is instruction 51, part of which is at 80 through 81. But, I mean, it seemed to... The reason I'm asking about it, it seemed to me that when you read those together, I couldn't see that there was harmful error in the court's instruction when you put those two instructions together. Well, putting it into context, a CARPAD is not generic. You don't know what it means. If we look it up in the dictionary, you can't find it. The question is whether the instructions, the two of them, they cross-reference, either misstate the law or so confusing that a jury couldn't handle them. And I don't understand you to have answered Judge Schall's question about wherein lies the confusion, wherein lies the misstatement of the law. The confusion, I think, is proved by what the jury found. Well, the confusion has to be in the words of the instruction where your allegation is that the instruction is confusing. No, I don't think necessarily so. Otherwise, we would always have to reverse because the losing side would say, well, the jury ruled against me and the adverse verdict is the proof that the instruction was too confusing or wrong. No, I don't think so, Your Honor. I think if you take the word CARPAD, the court as a matter of law can make a determination that it is not generic. Is it a pad that goes... Did you move for summary judgment that it should be declared to be not generic? No, we did not. Well, then how can you complain that the court didn't rule as a matter of law to that effect? Well, I just think the decision of the jury, I mean, is it generic or is it not? The jury could be wrong, but the judge can't be wrong for not granting summary judgment of non-genericness when you never moved for summary judgment of non-genericness. That's correct. The judge can't be wrong. The jury could be wrong depending on the evidence. That's correct, Your Honor. I want to reserve the remaining time and try to answer your other questions. Very well. And if you could bring up, when you come back, Mr. Jones, those two instructions. I will. Thanks. Mr. Jay, good morning. Good morning, Your Honor. Welcome. You have a very famous name, if my recollection of history is correct, although your first name is a little bit longer than the famous John Jay of the treaty. So does the previous counsel. He used to be a quarterback, Bob Starr. I noticed that no relation between me, Your Honor, and the other John Jay that we've all read about. And Mr. Starr has departed, so we can't ask him a few questions. In any event, please give us your argument. Thank you, Your Honor. I'm appearing this morning on behalf of Apelli Brookstone Company, Inc., on this appeal. The record demonstrates, I think, that Carpet and Mr. Saylor got a very fair trial, and that Judge Reed, the district judge, painstakingly considered all the rulings he made in this case, particularly those which affected the ultimate outcome. All of the trial court's decisions in this case should be affirmed by this court. The first question that was addressed by Mr. Joseph was the patent issue. Summary judgment is certainly permitted under the law, under 35 U.S.C. Section 103, when it's appropriate, and in this case it was. There were two prior art patents, the Roble and the Schumacher patents, neither of which were submitted to the USPTO, which were the basis of Judge Reed's ruling in favor of Brookstone on summary judgment. It's not relevant that they weren't submitted, right? Because we're not talking about inequitable conduct. We're just talking about obvious. That's true, Your Honor, but they weren't examined by the Patent and Trademark Office. This is a relatively simple invention. It's a rectangular, flat vinyl mat. We know what they look like. And Roble and Schumacher both disclose the same alleged invention. Mr. Joseph spent a lot of time talking about the notion that neither the inventions under Roble or Schumacher were commercially successful. I don't think that's particularly relevant on this appeal, and to the extent that commercial success of those prior inventions was somehow relevant to Judge Reed's determination on summary judgment, there is no evidence in the record regarding that issue. Indeed, one of Your Honors asked the question of Mr. Joseph, when the summary judgment issue came up on the patent question, was an evidentiary record created on the question of obviousness with respect to commercial success and lack thereof for the Roble and Schumacher inventions? Well, there wasn't. There is an affidavit from Mr. Saylor that's in the record. It's basically a two-paragraph affidavit where Mr. Saylor says, I've been in the car business for ten years, and I've never seen the Roble or Schumacher products advertised in any catalogs. Of course, if they didn't work, if they didn't work, then the Saylor invention is somewhat different, and you can presumably conceive that it is somewhat different, and if that difference made it work, that would clearly be a factor in obviousness, wouldn't it? It could be a factor, Your Honor. I don't think, frankly, that the alleged Saylor invention was anything different than what was disclosed in Roble and Schumacher. Did either Roble or Schumacher have a hollow sleeve into which an insert was placed? They both, into which an insert was placed? Yes, they both did. The only arguable difference is that Saylor specifically discloses the use of a, I think he calls it a reinforced hose. It's a garden hose. Right. Both Roble and Schumacher. In lieu of what in the other two prior art patents? The other two prior art patents talk about a compressible radial material. Why wouldn't that include the specie garden hose? It does. It does, and that's why the Saylor patent is obvious. I wanted to talk for a moment, Your Honors, about the question of willful infringement. Brookstone brought its motion for judgment as a matter of law, obviously at the close of the plaintiff's case. CARPAD presented two witnesses in its case, Mrs. Saylor and a gentleman who was associated with the company that supplies vinyl to the CARPAD company. This is willful infringement of the trademark. Yes, Your Honor. So as Judge Schall points out, if there's no trademark infringement because it's generic, then we don't reach that issue. Yes, and that was the last point I was going to make on this topic, Your Honor. With respect to the issue of genericness, there's no question that instructions 28 and 51 given by Judge Reed were correct, and they fully comported with the law. You can say there's no question, but you heard Mr. Joseph claim that either they were unacceptably confusing or they misstated the law. I think he said both, but he certainly said the former. And so your response, pinpoint response is? I have three responses, Your Honor. First of all, Mr. Joseph never presented any alternative instructions, either to the trial court or to this court. He never proposed any alternative instructions. So if they were so confusing, he should have said something before. And point number two is that if you read those instructions and the authorities that they rely on, they do accurately recite the law. And with respect to instruction number 28, which you discussed with Mr. Joseph, your paraphrasing of that instruction was exactly correct. The jury did have the option to determine whether this mark was generic, but they also had the option to determine whether it was descriptive, suggestive, or arbitrary or fanciful. Now, Brookstone did move in limine for an order from Judge Reed that would have said CARPAT as a matter of law is neither arbitrary nor fanciful, and he denied that motion. So he let the jury pick on the special verdict form, which is part of the record. What is this mark? Where does it fall on the spectrum of trademarks? With respect to instruction number 51, this is a standard trademark instruction that has to be given in any trademark litigation case that goes to a jury. Mr. Jay, let me ask you, with regard to instruction 28, getting back to that for a moment, it's on 76, the blue brief, the reference to Kleenex, do you think that's at all confusing? I mean, Kleenex is a brand name. I mean, my initial reaction was that the instruction at 51 is a clear and correct statement of the law, but it does seem that if you look at instruction 28, the reference to Kleenex could be a little confusing. What do you say about that? I disagree, Your Honor. With all due respect, I think if the jury was told merely that evidence of use of Kleenex as a noun rather than an adjective without any further description of what that means would maybe confuse the jury. Some jurors may have forgotten from grammar school what the difference between a noun and an adjective is. The other comment I have, Your Honor, in response to that question, is that that phrasing and the use of the example of Kleenex, which we're all familiar with, comes out of a specific case. I mean, it's not cited in the instruction that Judge Reed gave to the jury, but it is- You're saying that this is an approved instruction? Yes. Who was blessed in litigation? Yes. And so with respect to the issue of the jury instructions, numbers 28 and 51, Mr. Joseph is not arguing, as I understand it, on this appeal, that the jury's finding of genericness was contrary to the great weight of the evidence. He's simply saying that Judge Reed somehow erred in giving instructions, numbers 28 and 51, to the jury. We respectfully disagree with that. Was there a charge conference at which there were oral suggestions made about altering these pattern or model jury instructions? Prior to the instructions being finalized, Your Honor, there was a lengthy conference with the judge's clerk where a record was made, where an opportunity was available to either side to object to instructions. And you're saying that in that setting there was no objection raised by Mr. Joseph to any portion of instructions 28 or 51? In fact, there was, Your Honor. Mr. Joseph did object to instruction number 28, and he specifically objected to the use of the word strong in that instruction. Only? That was his only objection to 28? That's my recollection, Your Honor. Judge Reed took a break. He went back. He did research. In fact, he told Mr. Joseph, he said, I'm going to go back and check Jay's authorities, and if they're right, I'm going to give that instruction. He went back. He checked the authorities, and that's what the law says. So that takes care of 28. Now how about 51? Did Mr. Joseph say anything by way of objecting to any portion of the tentative instruction later issued as 51? To my recollection, he did not, Your Honor. And it's certain in addition that he did not submit his own counter-instruction as to either 28 or 51? That's true. So your view is he's waived everything that he's trying to argue here? It is. That's my view, Your Honor. All right, next. I guess the final comment I would like to make, unless Your Honors have any further questions, is with respect to the sanctions issue that arose during the course of discovery. First of all, I'm not clear in my mind as to why this issue is being raised on appeal. Let me ask you a factual question. The magistrate judge ordered a second letter to be sent to the customer list of Brookstone. There was an objection, and the judge modified the language a little bit. A final text was arrived at. Was that letter ever actually sent, that second letter? According to Mr. Joseph, at a subsequent hearing, Your Honor, it was, but I've never received evidence that it was. Okay, but he reports that it was sent. Yes, Your Honor. Now, does that make it moot? That was actually one of my points, is I don't know why this issue is being raised at all. First of all, the trade dress claim that was originally brought is not part of this appeal, and I also think the issue is moot. I guess one other comment on an issue raised in Mr. Joseph's brief that I would have pertains to the issue of the number of types of goods at issue. Let me ask you another factual question, because I have so much difficulty figuring out what happened here. In addition to the confusion about the letter, there was some confusion about whether a customer survey, which apparently Mr. Joseph said he wanted to do, and which would have been consistent with rather than violative of the discovery order, I can't figure out from the briefs whether that customer survey was done or not done. It seems like one brief says it was done and the other brief says it wasn't. Why can't we agree about whether there was a customer survey completed or not? Your Honor, we tried for 10 months prior to the trial of this case to get that consumer survey. It was never produced by Mr. Joseph. He acknowledged to Magistrate Judge Cook that it was not produced. I believe he acknowledged to Judge Reed that it was not produced. So what is he saying? It was done, completed, it's in his file, but it was never submitted to the court? Is that what the conclusion is? It was only in his brief submitted to this court, Your Honor, that I saw that Mr. Joseph claimed for the first time that a survey was done. But it's not in the record? No, Your Honor. For sure? For sure. Okay. In conclusion, with respect to the issue of the number of types of goods at issue, this issue, of course, is also moot if the court sustains the jury's determination of genericness and the propriety of Judges Reed's instructions on the trademark claim in this case, instruction numbers 28 and 51. I would point out- I'm sorry, I'm not following you. What is moot in light of what else? I'm sorry, Your Honor. Mr. Joseph has challenged Judge Reed's determination that only one type of goods was at issue in this case for purposes of calculating possible statutory damages. Since they weren't entitled to any damages, the issue is kind of moot, I think. I understand now. Thank you for clarifying. And I would simply point out in conclusion that to the extent there are any cases out there on this question, they favor Brookstone for the reasons we've stated in our brief. Let me ask you this. It may not be necessary to our decision. I'm not certain, but is there a potential problem of ultra vires or First Amendment infringement for the court to order a party against its will to utter certain words on paper? So maybe utter isn't the right word. To publish certain words in a letter to the customers of the opposing party? Not in a situation like this, Your Honor, where there's no authority that I'm aware of, certainly none that they've cited, that says Judge Reed's determination on that matter was wrong. Moreover, they did violate a discovery order. I'm assuming there was a violation of a discovery order. My question is, given that violation, how can we determine that it's within the power of the court to remedy that violation by ordering the transgressor to write a letter containing certain statements? As Judge Reed pointed out, Your Honor, in his ruling, the resolution of that question involved a balancing act, balancing Mr. Saylor's rights under the First Amendment with a compelling governmental interest of ensuring the integrity of the judicial process. How is the integrity ensured by or enhanced by the second letter being sent containing the statements essentially dictated by the court? If those were important statements that the customers of Brookstone should read, then maybe the court should have sent a letter. Well, it ensures the integrity of the process, Your Honor, by hopefully encouraging Mr. Saylor to abide by future court orders, either in that proceeding or any other. Moreover, Mr. Saylor never objected to sending out that remedial letter. Well, there may be waiver if there's no objection timely made, although there is objection now. But I'm trying to follow the logic here of how the integrity of the judicial process where there's been a violation of a discovery order's terms is enhanced and could only be enhanced by making the violator write a letter to the other side's customers. Why couldn't Brookstone write the letter, or the court write the letter, or there be some other way to tell the world, hey, we don't let people cheat. We don't let people violate discovery orders. So here's what we've done about it. If the world needs to know that, there are lots of ways that fact could be published. It's not clear to me why it has to be that Mr. Joseph is compelled to write a letter, a second letter. I suppose Brookstone or the court, Your Honor, could have written that remedial letter. But it was Mr. Saylor who sent out the letter in the first place. No question he was the violator. That goes beyond, I think, serious argument. But that doesn't necessarily mean he needs to be the author of the corrective letter. I suppose that's true. So then is a letter from him the least restrictive possible means for the court to vindicate its authority and uphold the sanctity of its discovery order that was limited to surveys and not soliciting class action co-plaintiffs? Under the circumstances of this case, yes. Because? Because Mr. Saylor sent out the letter initially. Had it been sent by Brookstone or the court, the recipients would have discounted the validity of the remediation letter based on its source. And so if Mr. Saylor sends out the remedial letter, they would understand that he was correcting mistakes. All right. Thank you very much. Mr. Joseph, you have some rebuttal. Thank you, Your Honor. It's only 50 seconds, but we'll give you several minutes. Thank you, Your Honor. I'll first address the generic description in instruction number 28. Mr. Jay was correct. I did object to that. I did object to certain terms in it, including strong evidence. I think it's misleading. Part of it, I'll quote, it's in appendix 76. Quote, plaintiffs themselves have repeatedly used the word carpet as a noun. The court is telling the jury that it has been used as a noun. No, that's not right. The full sentence, as I recall, says Brookstone contends that the plaintiff himself has used carpet as a noun. Obviously, it's up to the jury to decide whether that's the fact or not. All party contentions are assertions that may or may not be proven by the evidence. That's precisely what the jury is to decide. It seems to be implying, first of all, grammatically you're 100 percent correct. Okay? We are talking about a jury who is certainly not as educated as we are, sitting in Reno, Nevada, reading this phrase, plaintiffs themselves have repeatedly used the word carpet as a noun. Then it goes right on. You are instructed that evidence of a trademark owner's own generic use of his trademark is strong evidence that trademark is generic. He repeats generic rather than saying as a noun. So it's implying strongly that plaintiffs not only used it as a noun, but they used it generically. I think instruction 28. It sounds like a very subjective reading of the instruction. I don't think that it necessarily implies anything. Well, I respect that. Are you saying that the judge is by code telling the jury you must find that it's generic because I think it's generic and you better also agree with me? Is that what you're saying? No. It's not by code. I think it's misleading. I think, and I did object to 28. I think it's misleading, Your Honor. And I'd like to go on to some of the other points. Misleading in the sense of coercive? It's forcing the jury to agree with what you think the judge's view is? Yes. Yes, I do. Concerning the- You're not concerned about the examples? I am concerned. Well, did you object to the examples? I objected to the entire instruction. I asked that that instruction be deleted. And no instruction be given? No. You can't try a case like that. I didn't object to instruction 51 at page 80 and 81 of the appendix that gives the four categories. But your motion was that 28 should be deleted and nothing should be put in its place. That's correct. In fact, if you went through all the jury instructions, one of the problems with this case is the jury instructions were like 200 pages long. That's not before us. No, I'm just telling the court there were too many instructions in this case. It was too confusing. But you haven't objected on the grounds of too many. You've objected that two particular ones were defective for reasons you argue. Just two questions. One, Mr. Jay said, and you heard him say this, that this instruction with the reference to Kleenex and instruction 51 were both patterned instructions that have been, I'll use the word, blessed in previous cases. Is he wrong on that? He says they come from previous cases. I believe that most of these instructions were taken from the Ninth Circuit pattern instruction book. Now, I don't know if every word of every instruction was blessed, and I don't think it matters. The question is 28 and 51. We're not talking about any other instructions. Were 28 and 51 taken from the pattern book? Not exactly, but substantially. The second question is what Mr. Jay said when he was up there with respect to the remedial, what we'll call the remedial letter. He said that he never got a copy of it, but that you said it was sent. Is that correct? Yes, it was sent, and I wanted to highlight to this court, we objected to it strenuously on First Amendment grounds. We sought an injunction pending appeal before this court, which was denied, so he didn't have to send a letter. We thought that it was unconstitutional to require a plaintiff to put words in his own mouth. But why isn't it now moved? The letter was sent as required with the verbiage the court ultimately insisted on, and so whatever the consequences are, they are over. Well, that's true to some extent. The rest of the order prohibited us from introducing evidence from the survey. A survey was conducted. Just stick with me. Mr. Jay argues that the issue of your being required to send the second letter is a moot point because it's already been sent. Do you agree that it's moot or not? I disagree. How is it not moot? I think it's important that First Amendment rights be firmly decided and affirmed. Even in retrospect, Mr. Saylor should know that he had a constitutional right to do what he did. And if I recall the Supreme Court decision, the Moore case, I can't remember the full one, but it was an election case and something was moot because the election took place. The Supreme Court ruled that if it was likely to come up again, that situation, that the court could still rule on it. I've gone way over time. If there are no more questions, I'll submit the case. Thank you very much. Thank you. We thank both counsel and will take the appeal under advisement.